THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DON McFEE, Defendant-Appellant.

First District (4th Division)   No. 1—89—3109

Opinion filed May 21, 1992.—Rehearing denied June 19, 1992.

Michael J. Pelletier and Ann C. McCallister, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Judy L. DeAngelis, Special Assistant State's Attorney, and Renee Goldfarb and Susan Smith Snyder, Assistant State's Attorneys, of counsel), for the People.

JUSTICE JOHNSON delivered the opinion of the court:

Defendant Don McFee and codefendant Timothy Tolliver were charged by indictment with armed robbery (Ill. Rev. Stat. 1987, ch. 38, par. 18—2), armed violence (Ill. Rev. Stat. 1987, ch. 38, par. 33A—2) and two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1). The State nol prossed the counts of felony murder, armed robbery and armed violence. The trial court granted codefendant's severance motion and separate trials were conducted. Defendant was

convicted of two counts of first degree murder (Ill. Rev. Stat. 1987, ch. 38, par. 9—1), following a jury trial in the circuit court of Cook County and was sentenced to natural life without parole in the Illinois Department of Corrections. On appeal, defendant contends that (1) he was denied a fair trial because the State violated its discovery obligation by failing to disclose oral statements he allegedly made to an assistant State's Attorney; and (2) the evidence was insufficient to prove his guilt beyond a reasonable doubt for the murders of Debra Dehn and Denise Michaels.

At trial, Chicago police officer Steve Martinez testified that he found Denise Michaels lying at 114th Street and Doty Road. He stated that she had been shot in the back of the head but that she was still breathing. Michaels died the following day. The witness stated that he also found Debra Dehn dead with gunshot wounds to the face approximately 15 feet to the north of Michaels. He further stated that Michaels' car was parked in a field about 350 feet away and that the engine was running.

Dr. Thaddeus Melko, evidence technician for the Chicago police department, testified that because of Dehn's disability as a double amputee and because of the way the blood leading to the victim was pooled, she must have been carried to the location where she was shot. The witness stated that there was a small drop of blood found on the driver's side of Michaels' car. The witness also testified that he recovered a Smith & Wesson revolver, two women's purses and a semiautomatic weapon from Michaels' vehicle. A denim jacket was also found at the scene.

Medical testimony established that Dehn was shot twice in the face at close range. Dehn was also shot in the back and that the bullet exited at her breast. An autopsy of Michaels' body showed that she was shot once in the back of the head, once in the left arm and once in the neck. Dr. Tae An, a medical examiner for Cook County, testified that both Dehn and Michaels died as a result of multiple gunshot wounds.

Robert Kapsalis testified that on November 17, 1987, at approximately 6 p.m., he was at Michaels' home with her daughter, Lisa, Chris Shaffer and Dehn. The witness testified that during his visit, Michaels returned home with her boyfriend, Tolliver, whose nickname was Renegade, and another man whose name the witness could not recall. The witness identified defendant as the man who was with Tolliver. The witness testified that defendant had a silver gun which he carried in a pouch and that Tolliver had a gun "like the police carry." He further stated that Michaels told him they were going to

"Cadillac's house" to get some money Cadillac owed her. The witness testified that defendant, Tolliver, Michaels and Dehn left the apartment together.

Edward Muscarella and Lisa both testified that on the night of November 17, 1987, defendant and Tolliver visited Michaels and Dehn at Michaels' apartment. Lisa stated that Tolliver called her on the telephone shortly after midnight. Muscarella testified that the denim jacket which was found at the murder scene belonged to Dehn and that it looked like the same jacket defendant was wearing that night.

Cortez Shields testified that on November 17, 1987, he lived at 11607 South Princeton and that he got home at about 8 p.m. that evening. He stated that upon arriving home, several people were there including defendant, Tolliver, Dehn, Michaels and Cadillac, Shields' brother. Shields further testified that defendant and Tolliver left the house at approximately 9 to 10 p.m. and that Michaels and Dehn were gone by that time.

Shields stated that he went to the store and a short time after he returned, defendant and Tolliver returned to the house. The witness testified that his brother, Cadillac, asked them, "Did you do that?" and that defendant and Tolliver left 15 to 20 minutes after their return.

Assistant State's Attorney Jay Kraning testified that he questioned defendant in connection with the double homicide. Kraning advised defendant of his rights and defendant agreed to speak to him. The witness testified that defendant began to give different variations of what happened on the night of November 17, 1987. He stated that defendant asked, "What if I said I shot the girls?" or "if I said I didn't shoot the girls but was with Tolliver, what would happen to me?" After about two hours, a court reporter entered the room and recorded defendant's statement.

In the court-reported statement, defendant stated that on November 17, 1987, he was with Tolliver, Michaels and Dehn in Michaels' car. He stated that Michaels was driving and that Dehn was in the front seat next to her. He and Tolliver sat in the back seat. He further stated that Tolliver and Michaels were arguing about money Cadillac owed her and that Tolliver told her she was not going to get paid. Tolliver then pointed a silver-plated gun toward Michaels and fired one shot. He stated that he got out of the car and started running toward the house at 116th and Princeton when he heard another shot. After arriving at the house, defendant met Tolliver at the back door and both men went inside where Tolliver talked to Cadillac. Defendant and Tolliver then went to defendant's aunt's house, where

Tolliver called Michaels' daughter and told her that her mother had been shot. Defendant then went to his cousin's house, and Tolliver went to defendant's mother's house.

On cross-examination, Kraning testified that after defendant made his court-reported statement, he prepared a memo describing the procedure he used in taking the statement. The memo stated that the substance of defendant's oral statement was substantially the same as the court-reported statement. The witness stated that the memo did not include the fact that defendant had repeatedly called Kraning into the interview room and changed his story.

On redirect examination, the following testimony was adduced:

"MR. EBERHARDT [Assistant State's Attorney]: During one of the many conversations you talked about you had with Mr. McFee that night, did he tell you that he shot one of the girls?

THE WITNESS: He told me one time—he described to me how the one victim who had no legs, who was sitting in the front of him, facing him with her back to the dash, and the other victim was shot in the head. She started crying, and he was laughing because she was jumping, because she couldn't get out of the car because she had no legs. And then there was the shot. And then, again, he said, 'I'm taking all that back. I didn't say that.'

MR. EBERHARDT: Did he say that he shot her at that point, and then he retracted that?

MR. SPECTOR [Defense Counsel]: Objection, asked and answered.

THE COURT: You may answer.

THE WITNESS: I believe at that point he said he shot her."

The witness also stated that he considered defendant's statement about having shot Dehn to be an admission.

The following day, defendant moved for a mistrial on the grounds that the State violated discovery rules by failing to disclose inculpatory statements allegedly made by defendant to an assistant State's Attorney during interrogation. Defendant argued that the statements had to do with defendant changing his story and allegedly confessing to having shot one of the girls. The court denied the motion based on a finding that defendant had an opportunity to interview the witness prior to trial since he testified as to the oral conversations with defendant at an earlier hearing on defendant's motion to suppress

statements. After the State rested its case, the trial court denied defendant's motion for a directed verdict.

Chicago police officer Theatrice Patterson testified that he analyzed 18 fingerprints from the scene of the crime. The witness stated that two of the prints compared positively with Tolliver's but that none of the prints matched the fingerprints of defendant.

The parties stipulated that Chicago police officer Richard Chenow is an expert in firearms identification. Chenow testified that the bullets recovered at the scene of the crime and during the autopsies were fired from the Smith & Wesson revolver that was found in Michaels' car.

Defendant testified that on November 17, 1987, Tolliver and Michaels drove him from his aunt's house to Michaels' house, where he first met Dehn. Defendant denied having shown anyone a pistol or ever owning a gun. Defendant further stated that he, Dehn, Michaels and Tolliver drove to 116th and Princeton, where he and Tolliver went into the house and the women stayed in the car. Defendant stated that he went to the bathroom and returned to the car where he, Dehn and Michaels waited for Tolliver. After Tolliver returned to the car, the four went to the store.

Defendant stated that upon returning to the house Michaels got out of the car and spoke with a man named "B.D." She then told defendant and Tolliver to wait inside while she, Dehn, B.D. and a man named "Nick" went on an errand. Defendant stated that he went inside the house and played cards until about midnight and then returned to his aunt's house. He stated that the next morning he was watching television when he learned that Dehn and Michaels had been killed.

Defendant stated that two days after the victims were killed, he went to the police station to talk about what he knew concerning Dehn and Michaels. Both Tolliver and defendant's brother had been arrested in connection with the murders. Defendant further stated that he was interrogated by several police officers and by Assistant State's Attorney Kraning. The witness testified that he was beaten by police and told he was a liar. Defendant further stated that Kraning gave him the facts of the story for his court-reported statement. Defendant testified that he did not tell Kraning that he shot one of the victims or that he was present when the victims were shot. In rebuttal, each of the police officers present at the interrogation testified that he never hit nor did he see anyone hit defendant.

After closing arguments, the court gave its jury instructions. The jury found defendant guilty of two counts of first degree murder.

Defendant's motion for a new trial was denied. At the sentencing hearing, defendant was found eligible for the death penalty. However, the court stated that because Tolliver received natural life for the same offense, and because there were other mitigating factors, the court could not permit inconsistent sentences. Therefore, the court sentenced defendant to mandatory life without parole in the Illinois Department of Corrections. This appeal followed.

Defendant contends that he was denied a fair trial when the State violated its discovery obligations by failing to disclose inculpatory statements he allegedly made to an assistant State's Attorney. The State maintains that defendant has waived this issue by failing to request a continuance.

■ When a discovery violation occurs, the preferred sanction is to grant a recess or a continuance if it provides an effective means to protect the defendant from prejudice or surprise. (*People v. Velez* (1990), 204 Ill. App. 3d 318, 324.) Failure to request a continuance, in order to investigate an alleged undisclosed statement, generally waives subsequent objection to the testimony. (*People v. Jones* (1983), 119 Ill. App. 3d 615, 625.) Moreover, the imposition of sanctions for discovery violations is left to the sound discretion of the trial court. *Velez*, 204 Ill. App. 3d at 324.

■ In the case at bar, defendant's objections to Kraning's testimony and request to make a record concerning the discovery violation were overruled. After hearing Kraning's testimony, the trial court recessed for the day. The following day, defendant moved for a mistrial, or in the alternative, to strike Kraning's testimony due to the State's failure to disclose the statements before trial. The trial court found that the statements did not amount to a confession and that no discovery violation occurred. Based on the trial court's finding, we do not believe defendant's failure to request a continuance should preclude review of this issue. We therefore will address the merits of this appeal.

The State maintains that there was no discovery violation where defendant had ample opportunity to interview the witness. Alternatively, the State argues that even if there was a discovery violation under Supreme Court Rule 412(a)(ii), defendant failed to prove how he was surprised or prejudiced by any alleged noncompliance.

■ Supreme Court Rule 412(a)(ii) requires the State to disclose "any written or recorded statements and the substance of any oral statements made by the accused or by a codefendant, and a list of witnesses to the making and acknowledgment of such statements." (107 Ill. 2d R. 412(a)(ii).) In *People v. Cisewski* (1987), 118 Ill. 2d 163,

our Illinois Supreme Court set forth the standard to determine whether the State's failure to comply with the rule entitles defendant to a new trial. The court stated the following:

"Supreme Court Rule 412(a)(ii) (107 Ill. 2d R. 412 (a)(ii)) was promulgated to protect a defendant against unfair surprise, unfairness, and inadequate preparation [citation], as well as to afford the defense an opportunity to investigate the circumstances surrounding the statement. [Citation.] The rule is intended to encompass all statements made by a defendant which might have a bearing on the defendant's guilt or innocence. [Citation.]

\*\*\* However, the failure to comply with discovery requirements does not in all instances necessitate a new trial. [Citation.] A new trial should only be granted if the defendant is prejudiced by the discovery violation and the trial court failed to eliminate the prejudice. [Citation.] Among the factors to be considered in determining whether a new trial is warranted are the closeness of the evidence, the strength of the undisclosed evidence, and the likelihood that prior notice could have helped the defense discredit the evidence." *Cisewski*, 118 Ill. 2d at 172.

██ We find that the State's failure to disclose defendant's alleged statements constituted a violation of Supreme Court Rule 412(a)(ii). (107 Ill. 2d R. 412(a)(ii).) The statement was made by the accused and had a bearing on defendant's guilt.

However, we do not believe that defendant suffered sufficient prejudice so as to merit a new trial. The purpose of the rule is to protect against surprise and inadequate preparation. Here, defendant had access to the witness and an opportunity to investigate the circumstances surrounding the statements. Kraning made similar statements about defendant's oral statements at a pretrial hearing. Defendant did not attempt to interview Kraning and determine the nature of his testimony regarding defendant's oral statements. Moreover, defendant conducted a thorough cross-examination of the witness at trial, thus demonstrating that he was not surprised by the testimony. Lastly, defendant has not demonstrated how any further investigation into his alleged statements would have altered his trial strategy and possibly changed the outcome of this case. See *People v. Cisewski* (1987), 118 Ill. 2d 163, 173.

For the foregoing reasons, we find that the State's failure to comply with the rule does not necessitate a new trial.

Next, defendant contends that the evidence was insufficient to prove his guilt beyond a reasonable doubt for the murders of the two victims.

"On review, the relevant question is whether, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (*People v. Patrick* (1990), 205 Ill. App. 3d 222, 226, citing *People v. Young* (1989), 128 Ill. 2d 1, 49.) " 'A criminal conviction will not be set aside on review unless the evidence is so improbable or unsatisfactory that there remains a reasonable doubt of the defendant's guilt.' " *People v. Steidl* (1991), 142 Ill. 2d 204, 226, quoting *People v. Jimerson* (1989), 127 Ill. 2d 12, 43.

The State maintains that defendant is clearly guilty of first degree murder under the theory of accountability. "A person is legally accountable for the conduct of another when *** [e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." Ill. Rev. Stat. 1987, ch. 38, par. 5—2(c).

■ On balance, we believe the State satisfied its burden of proving defendant's guilt beyond a reasonable doubt for the murders of Dehn and Michaels under the theory of accountability. Witnesses testified that defendant and Tolliver were the last persons seen with the victims and that both men carried guns on the night the victims were murdered. Defendant's gun was found at the murder scene. Defendant himself admitted that he was with the victims on the night they were murdered and that he saw Tolliver shoot Michaels in the back of the head while they were in the car. Defendant did not try to stop Tolliver nor did he call for help in an attempt to save the victim. Moreover, testimony from expert witnesses established that only a single drop of blood was found in the car although both victims suffered multiple gunshot wounds. Defendant later testified that neither he nor Tolliver was present when the women were killed. He testified that two other men drove away with the women on the night of the murders.

Expert witnesses testified that Dehn, a double amputee, was carried to an open field where she was shot several times. Witnesses stated that defendant was wearing Dehn's denim jacket when they left Michaels' house. Police officers recovered the jacket near the bodies of the victims.

In evaluating the sufficiency of the evidence, it is not the court's function to retry a defendant. (*People v. Steidl* (1991), 142 Ill. 2d 204,

226.) "Instead, determination of the weight to be given to witnesses' testimony, their credibility, and the reasonable inferences to be drawn from the evidence are the responsibility of the fact finder." *Steidl*, 142 Ill. 2d at 226.

We believe that the jury properly determined from the circumstances of this case that defendant was an active participant in the crime. Viewing the evidence in the light most favorable to the State, we find that defendant was proved guilty beyond a reasonable doubt of the murders of Michaels and Dehn.

For the foregoing reasons, we affirm the ruling of the circuit court.

Affirmed.

LINN and McMORROW, JJ., concur.